## WILDE vs. JENKINS and others.

Where all the property and effects of an incorporated manufacturing society, together with its charter, were sold by the trustees and stockholders of the company, and purchased by three copartners with their copartnership funds, who elected themselves trustees of the corporation ; *Held*, that the corporation was not dissolved, and that the legal title to the real and personal property was still in the corporation for the benefit of the copartners, and that the stock of the corporation was copartnership property and distributable as such.

In a partition cause, where the original parties to the suit admit their several titles to the property by their pleadings, if one of them dies and the suit is revived against his heirs at law by default, the court may declare the rights, titles and interests of the several parties, without a reference as to the title, and without requiring the complainant to exhibit proof of the same or an abstract of the conveyances by which the title is held.

A reference to a master to examine and report as to general liens or encumbrances on the undivided interests or shares of the several parties, in a partition suit, is necessary before a decree for a sale of the premises can be made, and can in no case be dispensed with.

Where a retiring partner, upon a distribution of the partnership effects, agrees to bear a portion of the loss upon a note, taken by the other partners towards their distributive share of the effects, if it cannot be collected of the drawer, he stands in the situation of a surety for the drawer, *pro tanto*, and will be discharged from his liability if the holders of the note take a new security from the principal debtor and extend the time of payment, without the assent of such retiring partner.

Where copartnership accounts have been stated and settled between the parties up to a particular period, and such settlement has been acquiesced in for several years without objection, the evidence of error or mistake must be strong and conclusive to authorize the opening of the account.

The practice of opening accounts which have been adjusted by the parties themselves, who could best understand them, is not to be encouraged ; and it should never be done upon an allegation of error, supported by doubtful or even probable testimony only, where no fraud had been practiced by one party upon the other.

Where a bill, cross bill, and supplemental bill in the nature of a bill of review, between the same parties and relating to the same subject, are all abated by the death of one of the parties, the whole proceedings may be revived by one bill of revivor. The party reviving will not therefore be allowed the costs of two or more separate bills for that purpose.

In May, 1829, Seth Jenkins filed a bill, in this court, for the partition of a certain manufacturing establishment in the

August 5.

county of Columbia, on the south side of Major Abraham's creek, and a lot on the north side called the Van Rensselaer lot; to which bill James Wilde and John F. Jenkins were made defendants. In July thereafter, J. Wilde filed a cross bill against S. & J. F. Jenkins, alleging, among other things, that another manufacturing establishment, situated on the north side of the creek, also belonged to the same parties, although claimed to be held as corporate property belonging to the Columbia Manufacturing Society; and praying that the corporation might be decreed to be dissolved, and that the whole property on both sides of the creek might be partitioned between the parties; subject to the liens thereon of the parties respectively as to their several accounts with each other as partners and joint owners, and subject to the payment of two mortgages given to the complainant, by S. & J. F. Jenkins respectively, upon their several shares of the property on the south side of the creek. The defendants in those suits, respectively, put in their answers, replications were filed, testimony was taken therein, and the proofs were regularly closed. An order by consent was then entered, referring it to a master to take and state all proper accounts between the parties relative to the matters involved in those causes, but without prejudice to the rights of either party, as they would stand upon the pleadings and proofs, independent of such decree, by consent—all of which matters were reserved. That the master also take and report all or any proofs of the claims or defences of either party, with his allowance or disallowance of any item, matter or thing in relation thereto; with liberty to either party to except to his report. That upon the coming in of the report, the causes might be brought to hearing upon the pleadings, proofs and master's report thereon, and upon such exceptions to the report as might be taken by either party. And that upon such hearing, the several questions arising upon the pleadings and proofs should be open for discussion and decision, in the same manner and with the like effect as if presented upon pleadings and proofs, without such decree by consent having been entered. Subsequent to the commencement of the suit, by Seth Jenkins, for partition of the property on the south side of the creek, and

the Van Rensselaer lot, J. Wilde filed two several bills against S. & J. F. Jenkins and their wives, respectively, to foreclose the mortgages given to him upon their shares of the property on the south side of the creek; which bills were taken as confessed, and decrees for foreclosure and sale were entered in those suits, in August, 1829. After the master had proceeded for sometime in taking the accounts, under the order by consent, Seth and John F. Jenkins, in March, 1831, filed a bill in the nature of a supplemental bill and bill of review, setting forth the proceedings which had taken place in the several suits before mentioned, and alleging various errors in the accounts which had been stated at the time of the giving of the mortgages, which errors were not discovered until after the decrees had been entered in the mortgage suits. And praying, among other things, that the decrees of foreclosure in those suits might be opened and reviewed ; that certain judgments recovered against J. Wilde and John F. and Seth Jenkins, by G. W. Seaman and L. Reed and D. Lee, might be paid out of the partnership funds in the hands of Wilde ; and that all errors which had occurred in the settlement or statement of accounts, which had been made at the time of giving the mortgages, might be rectified in the taking of the accounts before the master. To this last mentioned bill J. Wilde, G. W. Seaman and Reed and Lee were made parties defendants. Pending the proceedings on the reference, and with a view to obtain a suspension of the proceedings in the foreclosure suits, Seth and J. F. Jenkins in their individual capacity, and as corporators, stockholders and owners of stock in the Columbia Manufacturing Society, mortgaged to J. Wilde all their rights titles and interests, joint or several, or as partners with Wilde, or as stockholders, owners of stock, or corporators in the C. M. Society, to the property on both sides of the creek, including the machinery, furniture, tools and fixtures, belonging to the manufacturing establishments, to secure the payment of the amount of principal, interest and costs due on the mortgages upon the property on the south side of the creek, and the several bills of costs which had been ordered to be paid by them in certain proceedings in the several suits above mentioned, or some of them, and all balances

which might be found due to J. Wilde from S. & J. F. Jenkins, or either of them, on the copartnership accounts, after deducting the balance, if any, which might be found due to S. & J. F. Jenkins from J. Wilde, on the accounting, and by the final decree in the suit for the settlement of the copartnership concerns. After the filing of the bill of S. & J. F. Jenkins, in the nature of a supplemental bill and bill of review, an order by consent was entered that all proceedings on the reference to the master should be stayed until the coming in of the answer to J. Wilde to such bill. In August, 1831, and before the coming in of that answer, Seth Jenkins died, leaving Sarah Jenkins his widow, entitled to dower in his real estate; and his children, Theodore H., Sarah, Cornelia the wife of Robert H. Jenkins, John H., Gertrude, Cyrus, Robert, Walter, and Lewis, his heirs at law. The several suits were afterwards revived by original bills in the nature of bills of revivor and supplement, against the children and heirs of Seth Jenkins; to which bills Sarah Jenkins, the widow, was made an original party in respect to her right of dower in the premises; she not having been a party to the original suit for partition, or to any of the suits except that for the foreclosure of the mortgage executed by herself and husband, on his undivided fourth part of the premises on the south side of the creek. And T. H. Jenkins and D. B. Tallmadge having subsequently administered on the estate of Seth Jenkins, they were afterwards made parties to the proceedings by supplemental bill. In May, 1832, orders were entered for the revival of the proceedings in the several suits, saving and reserving to the widow and infant heirs of Seth Jenkins all their rights, subject to the further order of the court in the premises. J. Wilde having put in his answer to the bill filed by S. & J. F. Jenkins, in the nature of a supplemental bill and bill of review, a replication to such answer was filed by J. F. Jenkins and by the guardian of the widow and infant children of Seth Jenkins; and by a stipulation between the parties, it was agreed that all the testimony and documentary evidence which had been taken or produced by either party, before the abatement of the original suits, should be used in the suits as revived. J. Wilde thereupon proceeded in the reference before the mas-

ter, although such proceedings were objected to by the counsel for the other parties. And he procured the master's report, stating an account between James Wilde on the one part and J. F. Jenkins and the widow and children of Seth Jenkins on the other, by which it appeared that there was a balance due to Wilde, including a computation of interest on the several items, of $3215,10, on the first of July, 1833. But in this computation, no part of the mortgages, originally given to Wilde upon the property on the south side of the creek, was included. The several suits, as revived, were finally brought to a hearing upon the pleadings and proofs, and upon the master's report.

*S. Stevens & C. Bushnell,* for J. Wilde.

*I. Williams,* for J. F. Jenkins, and for the widow and children and administrators of Seth Jenkins, deceased.

THE CHANCELLOR. For the purpose of understanding the complicated proceedings in this case, and the questions to be decided, it is necessary to go into an examination of the transactions between J. Wilde and S. & J. F. Jenkins, so far as they can be understood from the pleadings and proofs before me, somewhat at length. The Columbia Manufacturing Society was incorporated in February, 1809, for the purpose of manufacturing cotton and wool. (*See Priv. Laws of 1809, p.* 49.) And, by the act of February, 1812, the village of Columbiaville was organized, and certain municipal powers in relation to the same were given to the trustees of the C. M. Society. (*Laws of* 1812, *ch.* 9.) S. & J. F. Jenkins were original stockholders of the company and continued to be such stockholders until the purchase of the corporation and the corporate property, by J. Wilde and themselves, as copartners, as hereafter mentioned. Soon after the incorporation of the company, it had acquired title to a mill scite and manufacturing establishment on the north side of Major Abraham's creek, in the country of Columbia, and the manufactory was managed and carried on by the society, by its agents, R. Jenkins, Seth Jenkins and J. F. Jenkins, who

were copartners, under the name or firm of Robert Jenkins & Co. and who received a salary of $1500 a year from the society. In September, 1819, the C. M. Society entered into a contract with J. Wilde, a manufacturer, to carry on the establishment at Columbiaville for the term of five years from the second of the ensuing month of November. By this contract, the society was to furnish the stock, and Wilde was to manufacture it at certain stipulated prices, and to deliver the cloth and yarn to the agents of the society at the factory. By a sub-contract between Wilde and Robert Jenkins & Co., which firm, after the death of Robert Jenkins, consisted of Seth and John F. Jenkins only, it was agreed that Robert Jenkins & Co. should have two thirds of the profits which should be made by Wilde under his contract with the C. M. Society, and that he should receive one third of the salary which they were receiving as agents of the society. In June, 1822, Wilde purchased the mills and mill scite on the south side of the creek, directly opposite the factory of the C. M. Society, for the price of $7625, which he subsequently paid for out of his own funds, to Stanley from whom he purchased, including a mortgage thereon of $5000 to the Mechanics' Bank in the city of New-York. About the time of this purchase, it was agreed between J. Wilde and Seth and John F. Jenkins, constituting the firm of Robert Jenkins & Co. that they should have one half of the property on the south side of the creek at cost; and that Wilde should relinquish his claim to one third of their salary as agents of the C. M. Society, and should receive one half of the profits under his contract with the society. And that the business on both sides of the creek should thereafter be carried on by them as partners. A statement of their accounts was then made, up to the 2d of November, 1822. In May, 1825, Seth Jenkins removed from Hudson to Columbiaville, and the parties commenced mercantile business there, in a store, from which time their business was carried on under the name of James Wilde & Co. In the spring of 1826, the C. M. Society offered all its property, including the charter of the company, for sale. And James Wilde & Co. became the purchasers, at the sum of $23,000, including a judgment of about $10,000

in favor of Hicks, Lawrence & Co. which was a lien upon the property; of which judgment the purchasers assumed the payment. The residue of the purchase money was to be paid to the stockholders of the society in proportion to their stock, in three annual instalments, with interest at the rate of six per centum. The title of the property and the stock, or charter of the company, was to be transferred to the purchasers, upon the receipt of the last payment; and in case of a neglect to comply with the terms of sale, the previous payments of the purchasers were to become forfeited to the society. After this purchase, James Wilde & Co. took possession of the property on the north side of the creek, and made great improvements thereon in buildings and machinery; and they paid the interest on the judgment of Hicks, Lawrence & Co. and the two first instalments of the purchase money to the former owners of the stock, out of the profits of the partnership business. The municipal powers of the corporation were carried on by Wilde and S. & J. F. Jenkins, who were from time to time elected the trustees of the C. M. Society. But the accounts of the business of the factories on both sides of the creek were kept in the name of James Wilde & Co., and in the same books. During the continuance of the copartnership of James Wilde & Co., the partners became the purchasers of a lot on the north side of the creek, contiguous to the property of the C. M. Society; which lot was conveyed to them as tenants in common, and was paid for out of the partnership funds. About the 1st of June, 1827, Wilde became dissatisfied, and proposed a dissolution of the partnership, and a division and settlement of the partnership concerns. Seth and J. F. Jenkins urged a continuance thereof until the C. M. Society factory could be supplied with new and approved machinery, to be constructed under the superintendence of Wilde; but consented to settle the partnership accounts and to execute written articles of copartnership. And it was agreed that Wilde should convey to each of them an undivided fourth part of the property on the south side of the creek, and that they should execute mortgages to him upon their several shares thus conveyed, for the balance which might be

found due from them, respectively, on such settlement. On the 12th of June, 1827, partnership articles were entered into by the parties, by which the continuance of the partnership was limited to two years from the first of that month. And it was specified in the articles that J. Wilde was the owner of one half, and each of the other parties of one fourth of the partnership property and effects, including the stock of the C. M. Society ; and that the profits and losses of the copartnership should be shared or borne in those proportions. A stipulation was also inserted relative to the division of the merchandise, manufactured articles, stock on hand, book debts and other loose property and effects of the concern on the dissolution of the copartnership. A statement of the accounts was thereupon made, and entered upon the books of the copartnership, from which it appeared that there was due to Wilde from S. Jenkins, $4769,45, and from J. F. Jenkins, $3881,37. For the security of these sums, S. & J. F. Jenkins, with their wives, executed mortgages upon their respective shares of the property on the south side of the creek, which was conveyed to them by J. Wilde ; which mortgages were payable in two years, with interest. And the principal object of their supplemental bill and bill of review was to correct various errors, which S. & J. F. Jenkins alleged to have occurred in the statement of the accounts at that time, and to reduce the amount for which those mortgages were given.

The first question presented in the case is as to the nature of the interest of the several partners in the C. M. Society property, on the north side of the creek ; Wilde, in his cross bill to the original bill for partition, insisting that the Columbia Manufacturing Society was dissolved by the sale of its property and effects in 1826, and that he was entitled to a partition of the equitable interest of the copartnership in the same as real estate, subject to the mortgage thereon to Hicks, Lawrence & Co., and to the lien of the original stockholders for the unpaid purchase money. Upon examining the testimony in the cause as to the acts of the parties, in connection with the written articles of copartnership entered into, in 1827, it is evident that it was the intention of both parties, at the time of the purchase of the property of the C. M. Society, that the

charter of the company with its capital stock should be pur-
chased, so that the property and effects of the society might
be managed and carried on by the purchasers as corporate
property, under the act of incorporation. The real estate,
therefore, belonged to the incorporation as such, and could
only be conveyed by the proper officers of the corporation,
under its corporate seal. But the stock of the society, or the
equitable interest therein, belonged to the copartnership, un-
der their contract of purchase, subject to the lien of the other
stockholders for the unpaid purchase money. And, in the
statement of the partnership accounts, each party should be
credited with the amount due for his shares of the original
stock, in proportion to the number of shares held by him at the
time of the purchase, or with so much thereof as has not been
already credited. The interest of Seth Jenkins in this part
of the partnership effects being by the charter declared to be
personal property, it goes to his personal representatives, sub-
ject to the equitable claims of the other copartners thereon;
and it must be first applied to pay any balance which may be
due to Wilde upon the settlement of the partnership accounts,
exclusive of what is due upon the mortgages which are a
special lien upon the property on the south side of the creek.
All the property and effects of the C. M. Society, including
the stock and the right to manage the property and to exer-
cise the municipal powers relative to the village of Columbia-
ville under the charter, must therefore be immediately sold
by a master, upon a six weeks notice, to be published in a
paper in each of the cities of New-York and Hudson, and
in the state paper. Wilde and John F. Jenkins and the
personal representatives of Seth Jenkins must join with the
master in a transfer of all their interest in the stock of the
company and in the property and effects thereof to the pur-
chaser, in such manner as the master shall direct. And out
of the proceeds of such sale the master must pay to such of the
other stockholders as have an interest in the stock on account
of the last instalment upon the original purchase in 1826,
the amount due to them on that account, after paying to Hicks,
Lawrence & Co. or their assignees the amount due on their

judgment; upon such stockholders executing to the purchaser at the master's sale transfers of their respective interests in the stock of the company, in such form as the master may direct. If any one or more of such original stockholders shall refuse to receive the balance so due to him or them for such last instalment, with interest, then and in that case the master is to refund to the purchaser on the master's sale the amount thus due to the stockholders refusing to make such transfer. And subject to these directions the sale is to be in every respect at the risk of the purchaser as to the right or interest which he may acquire under the sale. Immediately upon the payment of the purchase money on the sale, the purchaser is to be let into possession of, and to be entitled to all the corporate property, funds and effects, wherever situated. He may apply to the court from time to time, as may be necessary to compel the several parties to these proceedings, and all others who have come into possession under them, *pendente lite*, or who have received from them any part of the property or effects of the society, to deliver possession thereof. And the several parties to these proceedings, as well before as after the sale, are to be enjoined from doing any act, either as stockholders or trustees of the C. M. Society, or otherwise, by which the interest of the person who may have become the purchaser at such sale may be in any way prejudiced, or impaired. The balance of the purchase money the master must bring into court, or deposit with the New-York Life Insurance and Trust Company, in the name of the assistant register, upon interest, to abide the further order of the court.

The several parties interested in the property on the south side of the creek, and in the Van Rensselaer lot on the north side, are entitled to have a partition thereof; for which purpose it is evident a sale will be necessary. Their several interests therein are therefore declared to be as follows: James Wilde is entitled to one equal undivided moiety or half part thereof, and to one half of the rents and profits since the dissolution of the partnership of James, Wilde & Co., on the first of June, 1829. John F. Jenkins is entitled to one undivided fourth part thereof, subject to the specific lien of the mortgage executed by himself and wife to Wilde, in 1827, and the costs of the

foreclosure suit upon the premises on the south side ; and he is entitled also to one fourth of the rents and profits thereof, for the same period, subject to the specific lien of the mortgage. The children of Seth Jenkins are also entitled each to one ninth of one fourth thereof, subject to the specific lien of the mortgage executed by Seth Jenkins and his wife to Wilde in 1827, and the costs of the suit for the foreclosure of the same, upon the premises on the south side of the creek ; and also subject to their mother's right of dower in both parcels. And each of such children is also entitled to one ninth, of two thirds, of one fourth, of the rents and profits since the death of Seth Jenkins, subject to the specific lien of the mortgage. The widow is entitled to dower in the premises, subject to the specific lien of the mortgage in which she joined with her husband, in 1827 ; and she is entitled to one third of one fourth of the rents and profits from the death of her husband. The personal representatives of Seth Jenkins are entitled to the rents and profits of one fourth of the premises from the dissolution of the partnership in June, 1829, to the death of Seth Jenkins, in August, 1831. The several shares of John F. Jenkins and of the children of Seth Jenkins are also subject to the specific lien of the mortgage executed to Wilde, by Seth and John F. Jenkins, in December, 1830, by way of security.

The 22d section of the title of the revised statutes relative to the partition of land, (2 R. S. 321,) requires the complainant or petitioner to exhibit proof of his title, and an abstract of the conveyances by which the same is held, if any of the defendants, whether known or unknown, make default. These bills of revivor and supplement are in the nature of original bills, only so far as the interests of the widow of Seth Jenkins are concerned ; but as to the interests of the children of Seth Jenkins, as his heirs at law, and the interests of the personal representatives of the decedent, they are bills of revivor merely. It is not necessary, therefore, that there should be any reference as to the title of the heirs at law who have made default, as that sufficiently appears from the bill filed by their father, from whom their title is derived. The only reference which is necessary before an order for the sale of the premises of which partition is sought can be made, is a reference under the forty-

second section of this title, as amended in April, 1830, (*3 R. S. App.* 155,) as to general liens or encumbrances on the undivided interest or share of any of the tenants in common, in favor of persons who are not parties to the suit. As the effect of a sale in partition is to divest the holders of such liens of all claim upon the estate itself, such a reference cannot be dispensed with in any case. It must therefore be referred to a master in the county of Columbia, to ascertain and report whether there are any such liens ; and upon the coming in and confirmation of his report, either party may apply to the court, upon any regular motion day thereafter, without further notice, for an order for the sale of the premises on the south side of the creek and the Van Rensselaer lot on the north side, with the machinery and fixtures belonging thereto and held in common.

The object of the supplemental bill and bill of review, filed by Seth and John F. Jenkins against James Wilde and others, was to open and review the decrees of foreclosure and sale in the mortgage suits ; to open the settlement or stated account of the the partnership transactions made in June, 1827, for the purpose of correcting various alleged errors in the statement of the account, for the balances on which settlement the mortgages were given ; and to bring forward a claim against Wilde in favor of Seth and John F. Jenkins, as survivors of Robert Jenkins, for one half of the alleged loss upon the notes of Wm. Mayrant, taken by them upon the settlement of a former partnership concern between them and Robert Jenkins, in November, 1815. In relation to this last mentioned claim, Seth and John F. Jenkins alleged, in their bill, that upon the settlement in November, 1815, Wilde agreed that if the Mayrant notes should not be paid, he was to be responsible to Robert Jenkins & Co. for the one half thereof ; and they produce a written memorandum to that effect at the foot of the account then stated, and above the names of R. Jenkins & Co. and James Wilde which are subscribed thereto, the latter in the hand writing of Wilde. By the answer of Wilde, he denied that he ever agreed to be responsible for any loss upon the Mayrant notes. He says the business of the copartnership was carried on in the name of J. Wilde only, and that these notes

were taken for partnership property sold to Mayrant, and the notes were therefore taken in his name. That upon the settlement and division of the partnership concerns and effects, these notes were taken by Robert Jenkins & Co. towards their shares, and that he endorsed the same for the mere purpose of transferring the interest of the partnership in the notes to them, without any expectation that he was to be holden for any thing upon such endorsement. And he swears, in his answer, that the memorandum at the foot of the account was not there at the time he subscribed his name to the account, but that it has been interpolated since. He also produced, in support of his answer, a release signed by Robert Jenkins & Co. at the time of the settlement in 1815, in which they discharge him from all claims and demands whatsoever up to that date, except the balance due from him on a note executed by him to them, which has since been paid. I am relieved from the unpleasant necessity of determining between these parties whether there has been a forgery on the one hand or perjury on the other; having arrived at the conclusion that if Wilde did at the time of the settlement agree to guaranty the payment of the notes, and to be liable for half the loss if they were not collected, he has long since been discharged by the acts of the other parties, if the amount has not in fact been collected by them. The only evidence which is relied upon to prove that the notes of Mayrant have not been collected, is the deposition of S. D. Miller, a lawyer in the state of South Carolina where Mayrant resided. He states that in November, 1822, he recovered a judgment against Wm. Mayrant upon a note given by him to John F. Jenkins, for the sum of $4116,64, dated the 4th of January, 1821, payable in twelve months from the date with interest. This judgment was afterwards revived by *scire facias*, $1000 having been previously paid thereon; and 200 was afterwards received by Miller, the attorney, from Mayrant, which he applied towards the costs of the suit and counsel fees. After the revival of the judgment, an execution was issued thereon. Miller left the bar in 1828, and directed the plaintiff to correspond with the sheriff in relation to the execution; since which time the witness knows nothing of the case, and of course cannot tell whether

the demand has since been collected.   This evidence is wholly insufficient to raise even a presumption that the original notes given by Mayrant to Wilde in 1815, and transferred to Robert Jenkins & Co. were not collectable at the time they fell due, in 1816 and 1817, or that they have not been collected.   The fact that John F. Jenkins held a note against Mayrant for about $4000, given in 1821, is not sufficient to authorize the court to presume it was given for the original debt which belonged to Seth and John F. Jenkins, as the survivors of Robert Jenkins who died in 1819.   And a return of the execution unsatisfied, or some other legal evidence, was necessary to show that the whole amount of the judgment recovered on that note was not collected by the sheriff.  Again ; if the fact was established that the note referred to in Miller's testimony was given for the original debt transferred to Robert Jenkins & Co. upon the settlement in 1815, as Wilde stood in the situation of a surety merely as to that part of the debt of which he had guarantied the payment by Mayrant, the giving time to the latter, for twelve months, as was done in the note referred to in the deposition of Miller, was a discharge of the liability of Wilde as such surety.

In the supplemental bill and bill of review filed by Seth and John F. Jenkins, they allege that the books of account of H. & S., kept by J. Wilde from 1819 to 1825, were partnership books, and not the private accounts of J. Wilde with the partnership and others.   And upon this allegation most of the supposed errors in the stating of the accounts, in 1827, are based.   The answer of Wilde, which in this respect is responsive to the bill, positively denies that these were partnership books any farther than they might have been rendered so by his keeping his own accounts with the partnership on those books.   I think, also, there is inherent evidence, upon the face of the books themselves, to show that his answer in this respect must be correct.

The charge that the property on the south side of the creek was bought and paid for by Wilde with the partnership funds, is not sustained.   The allegation in the bill is positively denied by his answer ; which in this respect is uncontradicted. At the time of the original purchase, he had no partnership

funds in his hands out of which the first payment could be made. And the $5000 mortgage upon the premises, which constituted much the largest share of the purchase money, was not paid until after the commencement of the present controversy. The statement of the accounts at the time of the giving of the mortgages in 1827, appears by the books to have been carefully and deliberately made; and Seth and John F. Jenkins, in their answer to the cross bill filed by Wilde, admit that they agreed at that time that there should be a settlement of the partnership accounts. And they say further, that on the 13th of June, 1827, the accounts of James Wilde & Co., and all other notes and accounts between the parties, either individually or by the name of Robert Jenkins & Co. or otherwise, were settled; and a balance was found due from Seth Jenkins to Wilde of $4769,45, and from John F. Jenkins to Wilde of $3881,37, for which sums they respectively gave their bonds and mortgages to Wilde. I am also satisfied from the examination of the books, and from the other evidence in the case, that both parties then understood it to be a full and final adjustment of the partnership concerns up to that time. It must therefore require very strong and conclusive evidence of error or mistake, to induce the court to open the accounts or go back beyond the adjustment thereof in June, 1827. The modes of keeping accounts are so various that it is difficult for third persons to understand them, in many cases, with all the lights which the evidence in a cause can throw upon recent transactions. The practice of opening accounts, therefore, which the parties who could best understand them have themselves adjusted, is not to be encouraged. And it should never be done upon a mere allegation of errors, supported by doubtful, or even by probable testimony only; especially where the parties to the settlement stood upon terms of perfect equality, so that there could be no pretence of fraud or imposition practised by one party upon another. In the language of a distinguished judge, "The whole labor of proof lies upon the party objecting to the account; and errors which he does not plainly establish cannot be supposed to exist."

The first specific error which is charged in the supplemental bill and bill of review is a loan made by Wilde to Robert Jenkins & Co. of $6628,02, out of the partnership funds, and which was allowed to him in the settlement as a loan from himself. This supposed error is fully accounted for or explained in the answer of Wilde; and it is very evident there was no foundation whatever for this charge in the bill. I am inclined to think a slight error occurred in relation to the stock of cotton, in consequence of carrying an error which had occurred upon the books previous to the change of interest in the partnership in 1822 into the accounts of the new concern, by which Wilde was charged with one half of that stock, when he would only have been accountable for one third if it had been carried into the accounts before the settlement and deducted from the supposed amount of profits at the time of the settlement. This, however, if it was an error, was one by which Wilde alone was prejudiced, and he does not ask to have it corrected. There was no error as to the tools, iron or lumber, or as to the charge of $5 for procuring the title to the property on the south side of the river. The difference in the first, arising from the change of the interests of the parties, was compensated by the stretching frame; and if $5 were paid out of the company funds for procuring the title, which however is denied, it appears to have been proper, as that property was to be taken by the partnership at cost. That necessarily included the expense of procuring the title from the former owner. There was no error in the settlement as to the store account previous to the charge of interest in 1822, as Wilde alone was interested in the store at that time. The alleged error as to the payment of Wilde, in November, 1822, of a balance due from the agents of the C. M. Society to the copartnership is denied by the answer, and is not sustained by proof. Indeed it is evident, from the manner in which the books were kept previous to that time, that the balance due from the agents of the C. M. Society belonged to Wilde individually; and the alleged error as to the blacksmithing is denied by the answer and is wholly unsustained by the proofs. The manner of transferring the Columbia mill account from leger I, and the cloth account, in connection with the account

of R. Jenkins & Co. appears to have been correct; and the store account was one in which Wilde alone was interested, as has been already observed. The credit to Wilde for interest must have been allowed by the parties, understandingly, at the time of the settlement; and there appears to be no reason to doubt that he was equitably entitled to it on account of his advances for the benefit of the copartnership, and in the purchase of the property on the south side of the creek. There is no foundation for the claim for the balance of Wilde's private cash account on leger I, or for charging him for the money paid by J. F. Jenkins, on the mortgage to the Mechanics' Bank, for which he settled with J. F. Jenkins and paid him in full. Neither was the loan to Seth Jenkins, in 1821, made by Wilde out of partnership funds, as charged in the bill of review. The errors which Seth and John F. Jenkins allege to have occurred against Wilde, in the settlement of 1827, and against which he protests, cannot of course be allowed in his favor, when he swears that no such errors occurred. The credit of interest which was made to Wilde at the time of the settlement, and which must have been allowed upon a consultation as to what was equitable and right in relation to his advances, cannot of course be inquired into at this time. The private accounts of Seth Jenkins and John F. Jenkins, respectively, against the firm, subsequent to the settlement in 1827, would of course be allowed on the taking of the accounts upon the reference by consent, and no new bill was necessary to bring those claims properly before the court. After a careful investigation of the accounts and of the testimony in this cause, I am obliged to declare that not one of the alleged errors, in the settlement of 1827, which are charged in the supplemental bill and bill of review filed by Seth Jenkins and John F. Jenkins, is sustained by the proofs. That bill was therefore improperly filed, and it must be dismissed, with costs to be paid by John F. Jenkins the surviving complainant therein, and by the representatives of Seth Jenkins out of the estate of the decedent, if any, in their hands to be administered, and to be paid by them in a due course of administration. The sale of the shares of the premises on the south side of the creek, covered by the several mortgages, must be postponed

until the sale can be made under the proceedings in the suit for partition, when the whole property must be sold together under the decree in partition and under the two decrees of foreclosure. And the master who makes the sale must, out of one fourth of the proceeds, pay to Wilde the amount due upon the mortgage executed by Seth Jenkins and wife, with the interest thereon, and pay to his solicitor the costs of the foreclosure suit; and the residue of that fourth must be brought into court for the benefit of the widow and children, subject to such liens as may exist thereon in favor of other parties, for costs or otherwise, and to abide the further order of the court. Out of another quarter of the proceeds the master is to pay to Wilde the amount due on the mortgage executed by John F. Jenkins and wife, with interest, and to his solicitor the costs of the foreclosure suit, and to bring the residue into court for the benefit of John F. Jenkins, subject to such liens as may exist thereon for costs or otherwise, and to abide the further order of the court. The residue of the purchase money, or the proceeds of the other moiety of the property, must be paid to J. Wilde, who is to be charged with the widow's share of the rents and profits of that property, from the time of the death of her husband until the day of sale, to be ascertained as hereafter directed; and when so ascertained, he must pay the amount into court for her benefit. The proceeds of the sale of the Van Rensselaer lot, when sold, must also be brought into court by the master, to be distributed according to the rights of the parties, as herein before declared, subject to the liens which may exist against any of the shares for rents and profits, costs, or otherwise.

The master having stated the whole accounts together, it will be necessary that there should be a re-statement thereof, and that separate accounts should be stated, according to the interests of the several parties since the death of Seth Jenkins; and the accounts must be brought down to the time of the sale of the several parcels of property respectively. But no new evidence is to be introduced before the master as to the accounts, or the rents and profits of the property, before the death of Seth Jenkins. In re-stating the accounts, the master is to compute interest, as in schedule A, annexed to

his former report, down to the time of the death of Seth Jenkins ; and must state the balance, as then due, in an account between J. Wilde on the one side and Seth and John F. Jenkins on the other, computing the interest up to the time of the date of such new report. In stating the accounts subsequent to the death of Seth Jenkins, the master must state one account, between Wilde on the one part and John F. Jenkins on the other, in which Wilde is to be charged with the rents and profits on J. F. Jenkins' share of the property on the south side of the creek, and to be credited with the one half of the rents and profits of the Van Rensselaer lot and the C. M. Society Factory, occupied by John F. Jenkins ; and such other items as may be proper in relation to their respective interests in the property occupied by each other. He is also to state another account, between Wilde and the widow of Seth Jenkins, in which Wilde is to be charged with the rents and profits of her dower right in her husband's undivided fourth part of the property on the south side of the creek, subject to all just allowances for taxes or otherwise. And the master is in like manner to state an account, between Wilde on the one side and the several children of Seth Jenkins jointly on the other, in relation to the rents and profits of the other two thirds of their father's share of the property on the south side of the creek. And the master is also to state accounts between the widow and J. F. Jenkins in relation to the rents and profits of her dower right in the Van Rensselaer lot, and between the children of Seth Jenkins and him in relation to the rents and profits of their interest as heirs at law of their father in the same lot. The master, in stating all such separate accounts, is to allow interest as may be just and equitable ; and all such accounts are to be continued down to the time of the sale of the property. And upon the coming in and confirmation of the master's report, and the reports of the master who makes the several sales which are or may be directed in this case, any of the parties interested in the proceedings may apply to the court, upon due notice to the other parties interested, for such further directions as may be necessary for the distribution of the funds which may be brought

1834.

Wilde
v.
Jankins.

into court, and for the apportionment of costs between the parties as may be just.

The master who states the accounts is also to be directed, if requested either by John F. Jenkins or the personal representatives of Seth Jenkins, and at the expense in the first instance of the party requesting the same, to state an account between themselves in relation to the partnership concerns and the use of the C. M. Society Factory since the death of Seth Jenkins, and to make a separate report thereof; to the end that upon the coming in and confirmation of the said separate report, such further decree may be made as between those parties as may be just. But the proceedings on that part of the reference is not to delay the general report of the master as to the other accounts which he is directed to state.

As against the widow of Seth Jenkins, who was not made a party to the original bill for partition, or to the cross bill of Wilde, the bill of revivor and supplement to which she was made a party is strictly an original bill. In the apportionment of costs, therefore, which is hereafter to be made, her dower interest is not to be charged with any portion of the costs which had accrued previous to the death of her husband; nor is she to be charged with any portion of the costs of the former proceedings before the master, under the reference by consent, to which she was neither a party or privy. And as one bill of revivor and supplement only was necessary to revive the proceedings in the partition suit, the cross suit, and the bill in the nature of a supplemental bill and bill of review, the solicitor of Wilde is not to recover costs for more than one of those bills. But the supplemental bill to bring in the personal representatives of Seth Jenkins, who had not taken out letters of administration at the time of filing the original bill in the nature of a bill of revivor and supplement, appears to have been necessary.