CHARLES BISPHAM, APPELLANT, *v.* ELI K. PRICE, EXECUTOR
OF JOSEPH ARCHER, DECEASED.

In the settlement of complicated partnership accounts by means of an arbitrator,
   Bispham was charged with one half of certain custom-house bonds, which Archer,
   the other partner, was liable to pay, and which obligations had been incurred on
   partnership account.
There was a reservation in the settlement as to certain liabilities, but this one was not
   included.
Archer's estate was afterwards exonerated from the payment of these bonds by a de-
   cision of this court, reported in 9 Howard, 83.
A bill cannot be brought by Bispham against Archer's executor to refund one half
   of the amount of the bonds, upon the ground that Archer had never paid it.
The reference to an arbitrator was lawful, and his award included many items
   which were the subject of estimates. It was accepted as perfectly satisfactory, and
   acquiesced in as such until long after the death of Archer.
No fraud or mistake is charged in the bill, and if an error of judgment occurred, by
   which the chance was overrated that the custom-house bonds would be enforced
   against Archer, this does not constitute a ground for the interference of a court of
   equity.
The statute of limitations also is a bar to the claim.

THIS was an appeal from the Circuit Court of the United
States for the Eastern District of Pennsylvania, sitting as a
court of equity.

The facts in the case are very fully stated in the opinion of
the court.

It was argued by Mr. *Gerhard* for the appellant and by Mr.
*Meredith* for the appellee.

The counsel for the appellant made the following points.

*First Point.* The express terms and proper construction of
the statement of the accounts between the parties by William
Foster, entitle the appellant to a recovery.

The "settlement" or "statement" of the accounts by Mr.
Foster, giving rise to this suit, is careful to provide for any such
contingency as that which has occurred. The amount to be
paid by Mr. Archer to Mr. Bispham, is declared to be "in
liquidation and full settlement between them, of all matters,
claims, and demands, relating to or growing out of the trans-
actions of their late firm, so far as they are now known, ascer-
tained, or believed to exist."

This seems to include every future contingency, and to re-
serve to each party the benefit of it. To prevent any possible
future misunderstanding, however, the paper goes on to provide,

First. "But as liabilities may hereafter be established or
ascertained,"

Second. "Or claims received, not now known to exist,
growing out of transactions during the partnership for partner-

ship account, it is understood that the same are not embraced in the foregoing settlement and determination by me as the agent and umpire of the parties, and especially any matter of such character contingent on the result of pending suits, is excepted from this adjustment of the affairs of said firm."

It will be observed, that there were no pending suits unless a reference was intended, as was doubtless the case, to the suits by the United States against Mr. Archer on the custom-house duty bonds in question — no others existed. There was one and one only, in New York, besides those, which are the foundation of this suit. And it is submitted that the court below erred in refusing to recognize, as pending suits, those in which judgments had been recovered, but the judgments themselves were unsatisfied — and that, too, when the phrase is used by mercantile men in an informal paper writing.

If a reference is only made to the second reservation above quoted, it is submitted that the appellant's case is made out. What difference is there between the actual facts, and the hypothetical case of a payment by Mr. Archer, and a repayment by Mifflin? Could there, in such an event, have been a doubt as to Mr. Bispham's right to participate in that recovery? The facts then would have been literally within the provision.

*Second Point.* If it is necessary to sustain the case for the appellant, the court as a court of equity, would reform the agreement and statement made in pursuance of it, to give relief to the appellant in the present case. It is a case within the principles of both mistake and accident. It is clearly settled, that where, either in a settlement, award, or even a solemn adjudication by the judgment of a competent court, there has been a technical mistake, such as has occurred in the present case, courts of equity will relieve against such a mistake. Courts of equity will grant relief in cases of mistake in written contracts, not only when the fact of the mistake is expressly established, but also when it is fairly implied from the nature of the transaction. Story's Equity, § 162.

Equity will give effect to the real intentions of the parties, as gathered from the objects of the instrument, and the circumstances of the case. The general rule, " *Quoties in verbis nulla est ambiguitas, ibi,*" &c., shall not prevail to defeat the manifest intent and object of the parties, where it is clearly discernible, on the face of the instrument, and the ignorance, or blunder, or mistake of the parties has prevented them from expressing it in the appropriate language. Id. § 168.

" The same principle applies where a legacy is revoked, or is given upon a manifest mistake of facts." Id. § 182.   8 Hare's R. 222; Osgood v. Jones, 10 Shep. 312; Williamson v. Johnson, 3 Halsted, Ch. 537.

So also in the case of settlements, so called.

A settlement of accounts, where one of the parties had but little knowledge of the matters settled, will be considered as *primâ facie* evidence, subject to be rebutted by satisfactory proof, under proper allegations, in the pleadings charging fraud or mistake as to particular items. Lee's Administrators *v.* Reed, 4 Dana, 109.

The court will open settlements made by mistake, although receipts in full have passed, and the note on which payments were made, has been taken up. M'Crae *v.* Hollis, 4 Desaus. 122. See also Shipp *v.* Swann, 2 Bibb, 82. Waggoner *v.* Minter, 7 J. J. Marsh. 173.

Where a bond was in form only a joint bond, but it was suggested to have been the intention of the parties to have made it joint and several, the court referred it to the master to inquire whether this was the intention of the parties. Where such intention appears on the face of the bond, the court will treat it as a joint and several bond, although it is only a joint bond in form. Ex parte Symonds, 1 Cox, 200. See also Rawstone *v.* Parr, 3 Russ. 539.

And so anxious is a court of equity to correct a mistake, that even parol evidence is admitted to prove one made by a solicitor in the draft of a settlement. Rogers *v.* Earl, Dick. 294. See also Shipp *v.* Swann, 2 Bibb, 82.

An account stated, may be set up by way of plea, as a bar to all discovery and relief, unless some matter is shown which calls for the interposition of a court of equity. But if there has been any mistake, or omission, or accident, or fraud, or undue advantage, by which the account stated is in truth vitiated and the balance is incorrectly fixed, a court of equity will not suffer it to be conclusive upon the parties, but will allow it to be opened and reëxamined.

Sometimes the account is simply opened to contestation, as to one or more items, which are specially set forth in the bill of the plaintiff. Story's Equity, § 523.

An award may be good for part and bad for part; and the part which is good will be sustained, if it be not so connected with the part which is bad, that injustice will thereby be done. Banks *v.* Adams, 10 Shep. 259.

To some extent the courts of equity and of common law exercise a concurrent jurisdiction on this point. Wilkins *v.* Woodfin, Administrator of Pearce, 5 Munf. 183.

Assumpsit lies for one against his copartner, for money paid him on a dissolution, and adjustment of the concerns of the copartnership, more than was actually due. Bond *v.* Hays, 12 Mass. R. 34. Or for one who has paid over by mistake more than his partner was entitled to receive. Id. 36.

It is very plain that the error which occurs in the case before the court was not a mistake of law, but of fact, or a technical mistake, for the reason that, at the time when that settlement was made, there was an actual existing liability for which the appellant was obliged to account.

Where a party has been subjected by a decree to a contingent and probable liability, he may be compelled to account, with a view to that liability, when the state of things shall happen upon which it may depend. Bank of the State *v.* Rose, 2 Strobhart, Eq. 90.

If, therefore, the occurrence in question comes within the definition of a mistake, it was clearly one of fact; a mistake of fact in this, that the account was struck upon the basis, that the contingency would never happen by which those payments were discharged. This view of the subject, however, necessarily points out another light in which it may be viewed as within the scope of equitable relief, viz. " accident."

The definition of " accident," as given by Mr. Jeremy, embraces this very case; he defines it to be " an occurrence in relation to a contract which was not anticipated by the parties, when the same was entered into, and which gives an undue advantage to one of them over the other in a court of " law."

And the exception, taken to this definition by Mr. Justice Story, is that the term " contracts " is not sufficiently general. Story's Eq. § 78, note 3. By the term accident, is here intended not merely inevitable casualty, &c., but such unforeseen events, misfortunes, losses, acts, or omissions, as are not the result of any negligence or misconduct in the party. Story's Eq. § 78. It may be stated, generally, that where an inequitable loss or injury will otherwise fall upon a party, from circumstances beyond his own control, or from his own acts done in entire good faith, and in the performance of a supposed duty without negligence, courts of equity will interfere to grant him relief. Id. § 89. Under this definition the unforeseen death of Mr. Archer fairly brings the appellant's case within that ground for equitable relief. See also Hachett *v.* Pattle, 6 Mad. 5.

*Third Point.* There has been an entire failure of the consideration upon which the money sought to be recovered in this action was paid by the appellant to the appellee's testator. Parish *v.* Stone, 14 Pick. 198, 210. Fink *v.* Cox, 18 Johns. 145; 8 Mass. 46; 15 Johns. 503; 5 Pick. 391; 2 Penn. State Rep. (Barr) 200.

This is the appellant's case, to which various defences have been made. It is said that Mr. Bispham released Mr. Archer. There is no release, (technical,) express or by implication. Agnew *v.* Dorr, 5 Whart. 131; Tyson *v.* Dorr, 6 Ib. 256. Nor

if it were a release would it be binding in a court of equity, where there was ground for relief on account of mistake or accident. Story's Eq. § 523; M'Crae *v.* Hollis, 4 Desaus. 122; Shipp *v.* Swann, 2 Bibb, 82. When construing the whole transaction together, with an effort and the right to arrive at the actual meaning of the parties, there can be no question that no such release, as is asserted in the answer, was designed or intended. Even construing exhibit E as a strict technical release, the defendant cannot at all sustain his construction of it. Mr. Bispham exonerates Mr. Archer from any further claims, "further" than such as can be made under Mr. Foster's settlement, is the grammatical construction. And the plaintiff really asks for nothing beyond this.

Again, it is said by the appellee that the agreement to state the accounts was a submission to an arbitrament, and that Mr. Foster's statement was an award, and is conclusive on Mr. Bispham. The appellant denies that this was an award; but even if it was, the case has been shown to be carefully excluded from the effect of Mr. Foster's statement. It is submitted that an award, not made a rule of court, cannot be binding where, if it were a rule of court, it would be set aside, and it is a familiar principle of the law of awards that courts will set aside an award made upon a mistake appearing, as here, on the face of the award itself. Watson on Arbitraments and Awards, 280. In all awards, not made under a rule of court, it is the settled law that a court of equity will relieve against them on the ground of mistake in any such case as the present.

Another suggestion of the appellee is that the account stated between the parties bars the appellant. The law is otherwise where, as here, there was a mistake, accident, or any similar event. The court will open settlements made by mistake, although receipts in full have passed, and the note on which payments were made has been taken up.

Again, it is said by the court below, that Mr. Bispham confirmed the settlement of the accounts twenty-one months after he had had the opportunity of examining it. This would be very well if Mr. Bispham's absence from Philadelphia put him into legal default. But it appears, from the evidence and record, that, from the date of the settlement of November 18th, 1835, to the confirmation of the account by Mr. Bispham on the 18th of August, 1837, he was absent from Philadelphia, and had not seen Mr. Archer who was in England and Canton. He had not, therefore, at the date of the confirmation, been informed that no money had in fact been paid on this account by Mr. Archer, but he was justified in supposing, from his (Archer's) letter of the 16th of November, 1835, above referred to, that

the judgments had been actually satisfied by him. If upon this supposition (a clear mistake in point of fact) Mr. Bispham confirmed the settlement by Mr. Foster, he would, upon every principle, be entirely justified in asking a court of equity to correct this mistake, particularly as he had been led into it by the assertions of Mr. Archer himself, that the liability on his part was complete, and that funds were provided by him for its immediate payment, which would be made as soon as they should be realized by his father. Twenty-one months after this letter Mr. Bispham certainly had a right to suppose them to have been actually so applied, and that the charge was therefore a proper one.

But even if Mr. Bispham did abandon or waive his right, under a mistake, it will not conclude him. A party who abandons his rights under a contract, from a mistake as to their character, is not concluded by such abandonment. Williams v. Champion and Goodrich, 6 Ham. 169.

The counsel for the appellant then argued that the Statute of Limitations did not apply.

*Mr. Meredith,* for the appellee, made the following points.

On behalf of the appellee it is contended that there is no equity whatever in the bill, for on this very subject-matter there were —

1. A submission and award.

2. Freely ratified and confirmed by the parties after full consideration, and with full knowledge of all material facts.

3. Payment of the amount awarded, in satisfaction, and

4. Mutual releases. (See Mr. Archer's letter, Record, p. 22,) and Mr. Bispham's letter, (Record, p. 24.)

It is also conceived, that —

1. If the plaintiff has any claim, he has a complete remedy at law.

2. That he is barred by the Statute of Limitations.

3. That he is affected by such laches as would bar him in equity, independently of the Statute of Limitations.

1. There was a submission and award on the very subject-matter in question. The submission is on the record, by which, after appointing Mr. Foster the joint agent of the parties in the settlement of all accounts between them, it is expressly agreed that his "decision shall be final and binding on all the parties concerned." By the award, dated 18th November, 1835, Mr. Foster did "award and determine" that Mr. Archer was indebted and should pay, &c. These bonds were part of the subject-matter of that award.

We contend that this case shows both an award and a settlement.

2. This award was freely ratified and confirmed by the parties after full consideration, and with full knowledge of all material facts. It was ratified as a whole, and by Mr. Archer, on the express condition that the whole should stand or none. See his letter of 16th November, 1835, and the paper signed by him of 19th November, 1835, (Record, pp. 22–23.) That paper, which the bill alleges was delivered by Archer to the comptroller on the 19th November, 1835, (Record, p. 3,) expressly provides that if Mr. Bispham objects to the settlement, Mr. Archer binds himself to abrogate the same, and open it for a new and final adjustment. On the 18th August, 1837, Mr. Bispham says, "the settlement . . . . . is perfectly satisfactory to me, and I do hereby confirm the same." He had taken, therefore, abundant time for the fullest consideration; and that he was acquainted with all the facts, not only appears from the evidence in the case, but has not been denied by Mr. Bispham.

3 and 4. The acknowledgment of payment, and the mutual exoneration are to be found in the letters above referred to. Mr. Bispham, in his letter of August 18th, 1837, (Record, p. 24,) after acknowledging the receipt of the amount due under the award and settlement, and reciting what he understood to be the exception, adds, "and intending this letter as entirely exonerating you from any further claims from myself, heirs, or executors, I am," &c. The appellant (Brief, p. 16) contends that this was not a technical release; but being founded on a sufficient consideration, it cannot be denied that it is, for all the purposes of this case, just as much a release as if the most formal instrument had been executed. The word "further" in the release, evidently means further than any unsettled claims which might be made on the firm. To be sure Mr. Bispham understood the meaning of the award to be the same, as will hereafter be more fully shown, and therefore, in that sense, he may be considered to have meant further than could be made under Mr. Foster's settlement.

The appellant's counsel, in the brief, presents three points, on each of which a few words will be said.

They are substantially as follow, viz.

1. That on a true construction of the award, which he calls a statement of account, the appellant is entitled to recover.

2. That the papers are, if necessary, to be reformed on the ground of mistake or accident, or both.

3. That there has been an entire failure of the consideration on which the money sought to be recovered in this action was paid.

(The remarks of *Mr. Meredith* upon the first and third of these propositions, are necessarily omitted for want of room.)

2. The second point advanced in the brief of appellant's counsel, is that, if necessary, the papers are to be reformed on the ground of mistake, or accident, or both.

It is to be observed on this, and the succeeding point, that the appellant's bill sets up no case in which they can arise; it does not allege any mistake, or accident, or failure of consideration, nor does it pray that the papers may be reformed, or his release cancelled, or that he may be relieved from his contract; on the contrary, it appears to claim that on the true construction of all the papers, agreements, &c., themselves, he is entitled to recover the money which he claims. Now a party cannot set up in argument, a case different from or inconsistent with his bill, and, therefore, there is no necessity for answering either the 2d or 3d point of appellant's brief. Nevertheless, a brief notice will be given to both.

And first on the question of mistake, the appellant's brief has been in vain carefully examined on this head of his argument, to discover what mistake it is that he alleges. The bill does not allege any mistake, and it is conceived that the brief particularizes none. On page 12, of the brief, it is said " where there has been a technical mistake, such as has occurred in the present case, courts of equity will relieve." Again, on page 15, " It is very plain that the error which occurs in the case before the court, was not a mistake of law, but of fact, or a technical mistake," &c. And again, on the same page: " If, therefore, the occurrence in question comes within the definition of a mistake, it was clearly one of fact; a mistake of fact in this, that the account was struck upon the basis that the contingency would never happen by which these payments were discharged." From these extracts, the following positions may be gathered, pursuing the order in which they are found, viz. That the mistake complained of, was, 1. A technical mistake. 2. Not a mistake of law. 3. A mistake of fact, or a technical mistake. 4. Clearly a mistake of fact, if the occurrence in question were a mistake at all.

What the " occurrence" was, that is here referred to, is not very clearly explained. It may be surmised, (from what follows in the same sentence,) to have been " the contingency by which these payments were discharged." If this be so, then the allegation is that Mr. Archer's dying six years after the settlement, was a mistake, but if so, it was not a wilful mistake, and surely not such a mistake as would induce a court of equity to set aside all the contracts he had made in his lifetime.

If the ground really be, that Mr. Bispham was ignorant of

the rule of law which discharges the estate of a deceased surety, against whom a judgment has been obtained jointly with his principal, the answer is twofold.

1. That there is no evidence whatever that Mr. Bispham was, in fact, ignorant of that rule of law. He nowhere asserts himself to have been so ignorant; and this court have assumed, that this rule of law is known and established, and formed a part of the written conditions of the bonds in question.

2. If such ignorance were averred or proved, then it is abundantly clear, that it would be wholly immaterial. See for this familiar principle, 1 Story's Equity, c. 5, § 111 to 115, inclusive, and the cases there cited. In the well known case of Hunt v. Rousmaniere, (8 Wheat. 174; 1 Pet. 1, 13, 14,) upon a loan of money, for which security was to be given, the lender took a letter of attorney, with power to sell the property, (ships,) in case of non-payment of the money, instead of a mortgage on the property itself, upon the mistake of law, that the security by the former instrument would bind the property as strongly as a mortgage, in case of death or other accident. The debtor died insolvent, and on a bill against his administrators to reform the instrument, or to give it a priority by way of lien on the property, the court denied relief.

On the head of accident, the case seems quite clear against the appellant. In matters of positive contract and obligation created by the party, (such as this was,) it is no ground for the interference of equity that the party has been prevented from fulfilling them by accident; or, that he has been in no default; or that he has been prevented by accident from deriving the full benefit of the contract on his own side. 1 Story's Equity, c. 4, § 101, et seq., and the cases there cited.

. Thus, if an estate be sold by A, to B, for a certain sum of money, and an annuity, and the agreement be fair, equity will not grant relief, although the party dies before the payment of any annuity. Mortimer v. Capper, 1 Bro. Ch. R. 156; Jackson v. Lever, 3 Bro. Ch. R. 605; and see 9 Ves. 246.

There is a sort of suggestion on pages 17 and 18, of the brief, that Mr. Bispham, at the date of the confirmation of the settlement, supposed that Mr. Archer had actually paid the bonds, and that he had been led into this mistake by the assertions of Mr. Archer himself. Of Mr. Bispham, it ought to be observed that he has not in his bill, or elsewhere, so far as is known, averred or insinuated that he supposed the bonds were paid. The settlement was made expressly on the footing that the bonds were not paid, and it was confirmed on the same footing. As Mr. Bispham does not appear to have made such a suggestion during Mr. Archer's lifetime, or hitherto since his death, it is not probable that he will ever sanction it.

It is stated, in the appellant's brief, that the partners never met after the expiration of the copartnership. There is no evidence in the case on that point, but the appellee's counsel is instructed to say that they did meet, and that Mr. Archer, after a lingering illness, actually died in Mr. Bispham's house, at Mount Holly, N. J., where he had been staying for several weeks as a guest.

Now, still looking at the settlement as relating to the bonds alone, it will be observed that the position of the parties was this. Mr. Archer was absolutely liable to the United States for the whole amount of the judgments, long before obtained against him. Mr. Bispham was liable to him for one half of what he should be obliged to pay, unless Mr. Foster's proportion could be recovered, and the recovery of that was quite desperate. Notwithstanding the award, Mr. Archer left Mr. Bispham at perfect liberty to accept or reject its terms. Mr. Bispham might either have determined to wait till Mr. Archer had actually paid the judgments, and then contributed his proportion, in which case he would, in all human probability, have been obliged (failing Mr. Foster) to pay the full half of the whole amount; or he might accept the terms proposed in the award, and by paying at once less than half the amount, be entirely exonerated. He deliberately chose the alternative.

This case seems to differ in substance from Hunt *v.* Rousmaniere, and other cases cited above, only in this remarkable circumstance, that whereas, in those cases, the party complaining was worse off, by reason of the unforeseen death, and lost his money thereby, in the present case, it is evident that Mr. Bispham is no worse off by Mr. Archer's death, and has lost no money thereby. If Mr. Archer had lived, it is not pretended that Mr. Bispham would have been entitled to recover the money back, and his death merely leaves him in the same position.

Mr. Justice CAMPBELL delivered the opinion of the court.

This is an appeal from a decree of the Circuit Court of the United States for the eastern district of Pennsylvania.

Joseph Archer (the testator of the appellee) and the plaintiff (Charles Bispham) in June, 1828, provided for the extension of a partnership, which was existing between them, for a term of five years. The plaintiff was to form a connection with another house, and to remain at Valparaiso, on the Pacific coast, for the term; while Archer was to manage the affairs of the firm in the United States. During the latter years of this partnership, Archer formed a partnership connection with another firm, and went to Canton, in China. The partners agreed to be equally

concerned in the profit or loss of all their business, whether transacted on the coast of the Pacific, the United States, or elsewhere. At the termination of this partnership, one of the partners was at Valparaiso and the other at Canton. In April, 1834, Archer, then at Canton, signed a paper which declares, that from " the long and repeated absence " of the partners from the United States " it is believed their accounts are in a state of confusion," and " in case of the death of either," " some diffi- culty might be experienced in the settlement." William Foster was therefore constituted " the joint agent " of the partners, " in the settlement of all accounts between them," and " that his de- cision shall be final and binding." This paper was countersign- ed in the November following by Bispham, and the authority of Foster confirmed. Twelve months after, (November, 1835,) Foster executed this authority, by a statement of the accounts between the parties ascertaining a large balance to be due to Bispham, and awarded and determined that it should be paid to him " in liquidation and full settlement between them, of all matters, claims, and demands relating to, or growing out of the transactions of the firm so far as they are now known, ascer- tained, or believed to exist ; " and provided, that " as liabilities might hereafter be established or ascertained, or claims recover- ed (received) not then known to exist, the determination was not to embrace them, and especially any matter of such a cha- racter, contingent on the result of pending suits, was excepted from this adjustment of the affairs of the firm."

Before the execution of this power, Archer had returned to the United States, and the settlement was evidently undertaken by Foster at his urgent solicitations. For, contemporaneously with the settlement, he gave to Foster a stipulation, reciting that Foster, having agreed to and ratified the final settlement of all accounts between the partners in relation to their business, that if it should happen that Bispham should, in his own name, object to this settlement, Foster is to be exempt from all blame, and he binds himself " to abrogate said settlement, and open it for a new and final adjustment."

At the same time, he wrote a letter to Bispham, stating that he had hoped to have met him in the United States, but that as he was about to embark for China, there seemed little chance of " their meeting for a number of years." He had resolved, in conformity with the letter of Bispham, of the 13th May, (this letter is not a part of the record,) to make a settlement of Archer and Bispham's affair with William Foster, as per statement, which he will forward, and he expresses the conviction that the settle- ment was made on liberal principles to Bispham. In this letter, after discussing various items of the account indicative of liber-

ality, and justifying others, he says, " if there is any thing in this settlement which does not meet with your approbation, I wish you to state it candidly to William Foster, with your reasons, and let him, as your agent, appoint an arbitrator, and my father, as mine, will name another, and let them say what is just and right under all circumstances, embracing the gain allowed you, on the shipment of raw silk in settlement, and open the account anew for adjustment. If the settlement meets your approbation confirm it, under your own hand, and send it to me at Canton." He promises, in this letter, to remit the balance against him from Canton.

A month later, he addresses a letter to Bispham, from England, in which he states, that " I wrote to our friend, William Foster, yesterday, about our settlement, and have stated to him, that if you were not satisfied with it, I was perfectly willing to leave it to an arbitration. He will show you the letter, if you desire it. I want the business closed, for should you or I make a finish of our career in this world, it never could be settled with any degree of certainty."

What communications were made during the year 1836, or the first half of 1837, between the partners or their agent, do not appear. The 18th of August, 1837, twenty-one months from the date of Foster's statement, Bispham, at Valparaiso, addressed Archer a letter at Canton, in which he acknowledges the receipt of a bill on London for the ascertained balance, dated June, 1836, declares that the settlement, made by William Foster, is " perfectly satisfactory," admits his responsibility for any unsettled claims which might be made, and concludes that " intending this letter as entirely exonerating you from any further claims from myself, heirs, or executors. I am, yours, &c."

It appears, from a particular averment in the bill of the plaintiff in this case, " that no liabilities have been established or ascertained growing out of transactions during the said partnership of Archer & Bispham for partnership accounts, or any payments on account of the same, other than those known to exist at the time of the settlement of the account of said Archer & Bispham by William Foster, and that no claims had been received by Bispham, growing out of the transactions of the firm." The record shows no other dealings between these partners during the life of Archer, who died in 1841. After his death, Bispham qualified as executor of his will, and acted for sixteen months, and was discharged upon his own petition.

The present controversy originates in the execution by Archer, in his individual name, of eight bonds to the United States for the payment of duties, as surety for James L. Mifflin, upon four of which William Foster was a co-surety. These bonds by

15*

arrangement, were debts of the firm. Mifflin having become insolvent, the bonds were not paid, and, in 1829, judgments were rendered against the obligors jointly, in favor of the United States, by the Circuit Court of the United States at Philadelphia. In 1831, Foster petitioned for his discharge as an insolvent, which was granted in 1834. These liabilities are included in the settlement of 1835, under the title of " statement of J. L. Mifflin's bonds, for which Archer & Bispham are liable." In the statement of the account, the bonds are enumerated, their dates, and the amount of principal and interest due upon them described. The share of William Foster, notwithstandi.., his continued insolvency and the fact of his release, is deducted, and the balance divided between the partners.

From the balance found to be due on the accounting to Bispham from Archer, his share of this liability is deducted. In the letter of November, 1835, to which we have referred, Archer says, — " During our absence, my father endeavored to effect a compromise with the government for Mifflin's bonds, and, since my return, I have also made an effort to do the same, but without effect, as the officers intrusted with such matters can make no abatement in the whole amount due with interest, unless the applicant produ:e all their books and papers, and affirm their inability to pay the whole amount. With these conditions I could not comply; and as there seems likely to be no benefit to us by longer delay, I have concluded to pay the amount. My father has funds enough of mine in his hands to pay the amount, which will be appropriated to that purpose as soon as he can realize them.

" You will observe, by the statement, that your proportion of the bonds has been deducted from the sum due you. I therefore absolve you from all claim for these bonds, your proportion having been paid to me in settlement." No other explanation of the transaction is found in the record. These judgments were not paid to the United States during the lives either of Foster or Archer; nor since by Mifflin, who is the survivor of both.

Upon the death of Archer we learn, from the bill and answer, that the executor of Archer " at all times" claimed, and now claims, the exemption of the assets in his hands from the judgments, for the reason that the remedy at law was extinct, and that equity would afford none. This court sustained that claim, for reasons reported, 9 Howard, 83.

This bill, in 1850, was a consequence of that decision. It charges that, in the settlement, it was assumed that the liability of Archer upon the bonds could be enforced by the United States, and, on that assumption, the share of Bispham in the

liability was paid to Archer; and that the estate having been discharged without a payment, he is entitled to a return of his money. The bill does not claim that there was any want of information, or any mistake in reference to the state of the liability at the date of the settlement. The inference to be deduced from the age of the judgments, Foster's connection with a portion of them, and his discharge by the United States, the item for counsel fees in the accounts, the intimate relations of the plaintiff with Archer and with the estate of Archer, and the absence of all averment in the bill, either of error, ignorance, mistake or fraud, — is, that accurate information of the judgments was possessed by all the persons connected with the settlement. The bill does not aver that these judgments were designed to be included in the reservation contained in the latter part of Foster's report; but the extract we have made from the bill evinces that this is a claim whose situation was known, and the relations of the partners to it at that time ascertained and adjusted. The evidence is satisfactory that this reservation did not include this liability, or any contingency in which it was involved. The statement of the liability in the accounts is particular and exact. The portion of each partner is determined with precision. Archer acknowledges to have received Bispham's share, and "absolves" him from further claim; while Bispham expresses his satisfaction with the whole result, and exonerates Archer from future responsibility. Whether we consider the averments in the pleadings, or the evidence, we must take the settlement as a sedate and deliberate adjustment of the affairs of the partnership, so far as they were ascertained and could be made the subject of an arrangement.

The design of the settlement was to extricate the affairs of the partners from the complication, uncertainty, and confusion in which they were involved. They had been engaged in distinct partnerships, carrying on business in different continents, apparently disconnected, and having but little opportunity even of correspondence. They had the prospect before them of a longer separation, and of diminished intercourse. Their partnership had ended. The ordinary mode of liquidating, after a dissolution, could not be followed. These partners, under these circumstances, and to attain their ends, consequently agreed to a reference of their accounts to a mutual friend, and clothed him with authority to make a final and binding decision. Was this lawful?

In Knight v. Marjoribanks, 11 Beav. 322, affirmed on appeal 2 Mc. & Gord. 10, the Master of the Rolls, after stating the usual course on a dissolution, said, "it is lawful for partners to deal with each other in quite a different way, if they think proper.

They may lawfully rely on the stock-takings, valuations, and accounts which appear in the books, and the accounts kept in the manner known to, or acquiesced in, by the partners. The stock-takings and valuations will be more or less accurate, according to the nature of the business and the property employed or engaged in the concern. It would, in many cases, be absurd to expect perfect accuracy, or to conclude that a transaction between partners, founded on statements appearing on the valuations and accounts stated in the books, could be set aside on the ground of some subsequent discovery of unintentional inaccuracy. When a question arises, you must in each case look to the circumstances."

In that case, the seat of the partnership was Van Diemen's Land. The partners resided in London, having no personal knowledge of the business, and dependent upon the reports of agents, coming at distant intervals, and received several months after their date. A sale of the share of one partner to another was impeached for inadequacy of price, error, and fraud. The Master of the Rolls said, "these parties, situated as they were, might fairly and honestly deal with each other, with respect to the share of any one, notwithstanding the ignorance in which they were as to the exact value. After all inquiry which can be made with respect to matters of this kind, the question of value becomes comparatively immaterial, if there was no deception, no misrepresentation or fraud, no unfairness."

In the case before us, entire accuracy is not to be looked for. Bispham is credited with proportions of profit arising from "unfinished business," and is charged with proportions of "estimated gains." There are items, which Archer pointed to, as debatable, which he had conceded, and there are allowances to him, which might be considered as narrow. He regarded the settlement as a liberal one to Bispham. He asked its acceptance as a whole, "to close the business," and provided for an arbitration if this was refused. There was not haste in the acceptance, but ample time employed for inquiry. After this, it was accepted as "perfectly satisfactory," and acquiesced in as as such, until long after the death of Archer.

We cannot infer mistake or error under these circumstances. We adopt the language of Chancellor Walworth, (4 Paige, 481,) "that the practice of opening accounts, which the parties who could best understand them have themselves adjusted, is not to be encouraged," and "the whole labor of proof lies upon the party objecting to the account, and errors, which he does not plainly establish, cannot be supposed to exist."

In the absence of mistake, or fraud, does there arise an equity in favor of the plaintiff, by the averment that it was assumed in

the settlement, that there was a liability against Archer, which the United States might, at all times, and under all circumstances, enforce; and on this alone the money was paid to him, or allowed to him in settlement?

In the able argument submitted to us for the plaintiff, this assumption is treated as the motive to the contract, that which constitutes its obligation, in one word, its consideration. If this assumption had been so comprehensive, and had entered so thoroughly into the inducements to the contract, the consequence might follow; but the argument is not supported by the evidence. The parties certainly assumed there existed an imminent liability over the firm which the United States could enforce against Archer, and for which it was prudent to provide.

Bispham, entertaining this opinion, by making a payment to the United States on the judgments to the extent of his share, would have been absolved from the claim either of the United States or of Archer. The United States having made no contract, except with Archer, and Bispham being liable only through him, might liberate himself by a payment to Archer, instead of the United States. This he accomplished.

It may be that neither party reckoned upon the neglect of the government officers about the collection of the debt, nor weighed the consequences of the death of Archer upon the binding efficacy of the judgments, but these were within the provisions of both of the parties to the contract, and its terms might have been moulded to secure the rights of each, according to such circumstances. This court has no competency to supply a providence which the parties to the contract withheld. The *corpus* of this portion of the contract, a debt obliging Archer, and through him affecting the partnership, the collection of which could have been enforced, and which both parties had the right to assume would be enforced, had an unquestionable existence. If there was an error, it was in overlooking the fact that there were some contingencies in which the debt might be extinguished as to Archer without the payment of money, and in making no provision for these.

An error of this nature, if it were plainly proven to exist, could not be regarded as a ground for equitable relief.

The case of Okill *v.* Whitaker, 1 De Gex & Smale, 83, 2 Phil. 338, was one in which premises had been sold, and enjoyed for several years, upon a contract for the sale of the residue of a term, both parties expressly contracting and settling the price on the belief that eight years only remained unexpired. Upon the discovery that there were twenty years, a bill was filed for relief. The Vice-Chancellor complained of the delay of the suit until after the death of the purchaser, where-

fore " those who had to administer justice between the parties
were deprived of all the assistance and information he could
give if he were living." He said that the only reasonable
ground, upon which the bill could be treated was as a bill to
rescind the entire contract, upon the alleged mistake, and adds,
" that for the present purpose it is not too much to say, that it
was their duty to know what was the state, what was the
condition of the property they had to sell."

The Lord Chancellor said that the only equity presented was
" that the thing turns out more valuable than either party sup-
posed."

The nature of this settlement and the motives presented in
the correspondence concerning it, would render it impossible for
the court to modify one portion, and to leave the rest in
force. It was presented to Bispham as a settlement made on
liberal principles, with the option to accept it as it was, or to
reject it altogether.

Without the benefit of the information and assistance that
Archer and Foster might give, after so long an acquiescence, the
case must be brought clearly within the limits in which courts
of equity are accustomed to interfere, to justify such a decree.
This has not been done. But if we could doubt upon the
intrinsic equities of the parties, the statute of limitations affords
a conclusive answer to the bill. The bill and the answer agree
that this item of the account was ascertained and stated, and
that all the liabilities of the firm were practically adjusted by
this settlement. The amount of the liability of Bispham was
credited to him, and he received the " absolution " of Archer,
from all further claim. The exception in the Pennsylvania sta-
tute in favor of merchants' accounts, according to numerous
authorities of the State courts, does not apply to the accounts
of partners *inter sese*, though this is not universally admitted.
1 Robin. Va. 79; 10 Pick. 112; 6 Monroe, 10. 4 Sand. Sup. C.
R. 311, (contra.) But however the law may be as to open
accounts, the settled doctrine of the court is, that the exception
in the statute does not apply to stated accounts. Spring *v*.
Grey, 6 Peters, 151; Toland *v*. Sprague, 12 Peters, 300.

If we regard this money as a deposit in the hands of Archer,
to be applied to a specific object, or to abide the action of the
government against him, in either case the statute would afford
a bar. The assumpsit in the one would be to pay the money
in a reasonable time, and a cause of action would accrue upon
a neglect of this duty. Foley *v*. Hill, 1 Phill. 399; Brookbank
*v*. Smith, 2 Y. & Co. Ex. R. 58; 13 Barb. 632; 11 Ala. R.
679; 4 Sand. S. C. R. 590.

In the other case, the liability of Archer was determined at

his death, and the right of the United States then extinguished. The facts were all known at that time, and the executor of Archer appreciated accurately the legal value of the facts, for the bill avers and the answer admits that he uniformly repelled the claim of the United States, and denied its validity. It is clear, therefore, if Bispham had placed this money to abide the issue of these obligations, the right to reclaim it arose at the death of Archer. Calvin *v.* Buckle, 8 M. & W. 680; Maury *v.* Mason, 8 Port. 211.

Our views upon this statute correspond with those expressed by the Supreme Court of Pennsylvania. Hamilton *v.* Hamilton, 18 Penn. State R. 20; Porter *v.* School Directors, Ibid. 144.

Upon the whole case, we conclude there is no error in the record, and that the decree should be affirmed.

## *Order.*

This cause came on to be heard on the transcript of the record, from the Circuit Court of the United States for the Eastern District of Pennsylvania, and was argued by counsel. On consideration whereof, it is now here ordered, adjudged, and decreed by this court, that the decree of the said Circuit Court, in this cause, be, and the same is hereby, affirmed with costs.